UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KEVIN THOMAS LACHER,

    Plaintiff,

  v.                                                                                 Case No. 18-CV-941

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

---

## DECISION AND ORDER

---

Kevin Lacher seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed.

## BACKGROUND

Lacher filed an application for a period of disability and disability insurance benefits alleging disability beginning on February 13, 2014, due to degenerative disc disease in the lumbar spine, joint dysfunction on the left side, pathological facture in the vertebrae, and high blood pressure. (Tr. at 171–72, 195, Docket # 12-3–12-10.) Lacher's application was denied initially and upon reconsideration. (Tr. 62–80.) Lacher filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on May 16, 2017. (Tr. 34–61.) Lacher testified at the hearing, as did Andrea Thomas, a vocational expert.

In a written decision issued June 29, 2017, the ALJ found that Lacher had the following severe impairment: history of compression fractures. (Tr. 22.) The ALJ further

found that Lacher did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 23.) The ALJ found Lacher had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations: occasionally climb stairs and ramps; never climb ladders or scaffolds; frequently balance; occasionally stoop, kneel, and crouch; never crawl; and avoid concentrated exposure to hazards such as unprotected heights and moving mechanical parts. (Tr. 23.) The ALJ found Lacher capable of performing his past relevant work as a recycler. (Tr. 26–27.) As such, the ALJ found that Lacher was not disabled from his alleged onset date through September 30, 2015, the date last insured. (Tr. 27–28.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Lacher's request for review. (Tr. 4–9.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported [her] decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from

the evidence to [her] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citing *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's ("SSA") rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### *2. Application to this Case*

Lacher argues that the ALJ erred in evaluating (1) the opinion of his treating physician, Dr. Paul Robey, and (2) his subjective complaints of disabling symptoms.

#### 2.1 Treating Source Opinion

An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2).[1] If the opinion of a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[1] On January 18, 2017, the SSA published the final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 Fed. Reg. 5844). The final rules became effective on March 27, 2017. For claims (like the one at issue here) filed before March 27, 2017, the SSA continues to apply the rules that were in effect at the time of the ALJ's decision. *See* 20 C.F.R. § 404.1527.

3

inconsistent with other substantial evidence in [the] record," the opinion must be given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. Social Security Ruling ("SSR") 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she must evaluate the opinion's weight by considering a variety of factors, including the length, nature, and extent of the claimant and the source's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the source is a specialist. *See* 20 C.F.R. § 404.1527(c).

The ALJ must always give "good reasons" for the weight given to a treating physician's opinion. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. "An ALJ can reject [a treating source's] opinion only for reasons supported by substantial evidence in the record." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)).

As of April 2017, Lacher had seen Dr. Robey, his primary care physician, once every six months or so since about 2000. (Tr. 431.) In 2008, Lacher fractured his back at work. (Tr. 278.) He underwent fusion surgery in July 2010. (Tr. 281–90.) Lacher appeared to be doing well post-surgery (Tr. 312–13), but in January 2014, he complained to Dr. Robey that he had been experiencing low-back pain for the past three days (Tr. 316). Upon physical examination, Lacher exhibited markedly diminished flexion of the lumbar spine and moderately diminished bilateral side bending. (Tr. 317.) Also, his gait was slow and mildly antalgic. Dr. Robey assessed an unspecified backache, prescribed Valium, and encouraged

4

Lacher to try to return to work a few days later. Lacher also had his lumbar spine x-rayed; the x-ray revealed a compression fracture at L1 and suspicion of a minimal compression fracture at L2. (Tr. 307–088.) Lacher's back pain persisted (Tr. 343) and he stopped working completely on February 13, 2014 (Tr. 195).

On February 28, 2014, Lacher presented to Dr. Robey for a preoperative evaluation and clearance. (Tr. 317–21.) He demonstrated a normal gait, moved all four extremities with normal range of motion, and had no joint redness, edema, or focal deficits. (Tr. 320.) However, he did have slightly diminished flexion of the thoracolumbar spine. A few weeks later, Lacher underwent kyphoplasty surgery at L1 and L2. (Tr. 318, 345.)

In September 2014, Lacher had an onset of back pain. (Tr. 345–46.) Physical exam notes indicate that he was ambulatory and walking without a limp, but he exhibited some low-back tenderness to palpation. (Tr. 346.) An x-ray revealed compression fractures at L1 and L2 with vertebral plasty changes and a new compression fracture at L5. (Tr. 342.) Lacher continued to have back pain in October 2014. (Tr. 321, 347.) He demonstrated low-back tenderness to palpation, had pain with range of motion of the lumbar spine, and changed position slowly during his physical exams. (Tr. 324, 348.) Lacher was scheduled for L5 kyphoplasty on November 6, 2014. (Tr. 321.) However, the surgery was canceled on November 5 because the most recent MRI revealed only a small endplate fracture that was not likely amenable to kyphoplasty. (Tr. 326.)

Over the following months, Lacher displayed significant improvement with chiropractic care. (Tr. 326, 348–60.) He reported being able to engage in more daily activities, such as shoveling snow, with less flareup of pain. (Tr. 359.) During an appointment with Dr. Robey on February 23, 2015, Lacher indicated that he was using only ibuprofen for pain and

5

that he had consulted a lawyer about applying for disability benefits. (Tr. 325–26.) He demonstrated moderately diminished flexion of the lumbar spine, but his gait was normal and the straight leg raise test was negative. (Tr. 326.) Dr. Robey explained to Lacher that his back pain probably would not get better and that he likely would have more compression fractures in the future. (Tr. 327.) Dr. Robey suggested that Lacher check to see if his insurance would cover maintenance chiropractic treatments. He also encouraged Lacher to stop smoking.

On March 25, 2015, Lacher presented to a new clinic complaining about low-back pain that radiated to his left lower extremity. (Tr. 361.) He claimed that his symptoms interfered with most activities, including bending, walking, sleeping, and working. (Tr. 362.) On physical examination, Lacher exhibited decreased range of motion in his lumbar back. (Tr. 365.) But his gait was normal, and he demonstrated no tenderness or deformity. The provider reviewed Lacher's imaging studies from 2014, noting that the fracture at L5 was healed. He also noted that there was no evidence of increased bone activity at L5, central canal or neural stenosis, or advanced degenerative changes. Lacher was encouraged to remain active and continue with his chiropractic care; he was not a candidate for further surgery.

In the summer of 2015, Lacher received maintenance chiropractic treatment. (Tr. 366–67.) During his two visits, he displayed mild to moderate grade joint restrictions, minimal to mild graded muscle spasm/hypertonicity, and muscle shortening, but no significant palpatory tenderness. Lacher reported he still experienced some mild pain; however, he claimed to no longer have significant flareups, though the pain seemed to get a little worse the longer he went between care. (Tr. 367.) During an ER visit for chest pains in September 2015, Lacher exhibited normal range of motion and no edema or tenderness. (Tr. 410.)

On April 20, 2017, Dr. Robey completed a "Treating Source Statement" regarding Lacher's physical conditions. (Tr. 431–35.) Dr. Robey opined that Lacher would be off-task more than twenty-five percent of the typical workday and would miss four or more days of work per month due to his impairments. (Tr. 431.) He further opined that Lacher could frequently lift and carry less than ten pounds and could occasionally lift ten pounds. (Tr. 432.) According to Dr. Robey, during an eight-hour workday, Lacher could sit for a total of four hours, stand for a total of two hours, and walk for a total of two hours. He also needed to be able to alternate between sitting and standing at will. Lacher, in Dr. Robey's medical opinion, needed to use a cane when he walked more than 100 yards.

As for Lacher's nonexertional limitations, Dr. Robey opined that Lacher could occasionally reach in all directions, frequently handle and push/pull, and continuously finger and feel with both upper extremities. (Tr. 433.) According to Dr. Robey, Lacher had no limitations using foot controls. He opined that Lacher could never climb stairs, ramps, ladders, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; and could continuously rotate his head and neck. (Tr. 433–34.) Finally, Dr. Robey opined that Lacher could never be exposed to unprotected heights; rarely be exposed to moving mechanical parts; occasionally be exposed to vibrations; and frequently operate a vehicle and be exposed to humidity and wetness, dusts/odors/fumes/pulmonary irritants, and extreme cold or heat. (Tr. 434.)

The ALJ assigned "some weight" to Dr. Robey's opinion. (Tr. 26.) The ALJ found that portions of Dr. Robey's opinion were "somewhat consistent with the evidence showing [Lacher] had limited range of motion and tenderness in the lumbar and thoracic spine as well as imaging studies showing compression fractures." (Tr. 26.) However, according to the ALJ,

7

Dr. Robey's opinion was "not fully consistent with the evidence because the physical examinations also showed [Lacher] had a normal gait or ambulated without a limp, had normal muscle strength, intact reflexes, and normal range of motion in all extremities." (Tr. 26.) The ALJ further reasoned that, "other than restating the nature of [Lacher's] conditions, Dr. Robey failed to explain how [Lacher's] conditions caused the limitations he opined." (Tr. 26.)

Lacher argues that the ALJ's step four finding is not supported by substantial evidence because she failed to factor in the functional limitations established by Dr. Robey in the RFC assessment. (Pl.'s Br. at 9–13, Docket # 13.) Lacher further argues that the ALJ erred in finding that Dr. Robey's opinion was inconsistent with the evidence in the record. (*Id.* at 13–17.) The Commissioner maintains that the ALJ's step four finding is supported by substantial evidence, as "[t]he ALJ considered Dr. Robey's opinion, adopting some of his limitations, while finding that others lacked support in the record." (Def.'s Br. at 10–14, Docket # 18.)

The ALJ did not commit reversible error in evaluating Dr. Robey's opinion. Contrary to Lacher's suggestion, the ALJ did include several of Dr. Robey's opined limitations in her RFC assessment. The ALJ directly adopted Dr. Robey's limitations concerning Lacher's ability to climb ladders and scaffolds, stoop, kneel, and crouch. (*Compare* Tr. 23 *with* Tr. 433.) Likewise, by restricting Lacher to sedentary work—that is, work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," 20 C.F.R. 404.1567(a)—the ALJ sufficiently accommodated the lifting and carrying limitations opined by Dr. Robey (frequently lifting less than ten pounds and occasionally lifting ten pounds). The ALJ also assigned greater restrictions than Dr. Robey regarding Lacher's ability to crawl and stand/walk. Dr. Robey opined that Lacher could

crawl occasionally (Tr. 434); the ALJ found that Lacher could never crawl (Tr. 23). Similarly, while Dr. Robey opined that Lacher could stand for a total of two hours and walk for a total of two hours in an eight-hour workday, (Tr. 432), the ALJ's sedentary restriction means that Lacher could stand and walk a total of two hours *combined*. *See* SSR 96-9p. Thus, the ALJ reasonably adopted those portions of Dr. Robey's opinion that were consistent with the evidence showing limited range of motion and tenderness in the spine and imaging studies showing compression fractures.

Furthermore, the ALJ provided sufficient reasons for not adopting other portions of Dr. Robey's opinion. First, the ALJ determined that Dr. Robey's more restrictive limitations were inconsistent with the record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). This finding is supported by substantial evidence. Although Lacher sometimes exhibited tenderness and limited range of motion during physical examinations, he frequently ambulated without a limp and had a normal gait, normal muscle strength, intact reflexes, and full range of motion. (Tr. 320, 324, 326, 346, 348, 349–50, 365, 410.) These exam findings are inconsistent with Dr. Robey's more restrictive limitations. To support his argument that the ALJ's claimed inconsistencies were "completely unsubstantiated," Lacher cites other evidence in the record that he believes is consistent with Dr. Robey's opinion. (*See* Pl.'s Br. at 14–16.) But all this shows is that Dr. Robey's opinion was consistent with some evidence but inconsistent with other evidence—a fact explicitly recognized by the ALJ. Because certain limitations were not consistent with other substantial evidence in the record, the ALJ appropriately did not assign controlling weight to Dr. Robey's opinion. *See* § 404.1527(c)(2); SSR 96-2p.

9

Second, the ALJ determined that Dr. Robey failed to explain how Lacher's conditions caused the limitations he opined. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Substantial evidence supports this finding as well. Dr. Robey generally asserted that his opinions were supported by Lacher's complaints of back pain and the imaging studies revealing compression fractures of the thoracic and lumbar vertebrae. (Tr. 432–34.) But he did not explain *how* those symptoms and findings supported the specific limitations he assessed. "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

### 2.2 Lacher's Subjective Symptoms

The Commissioner's regulations set forth a two-step test for evaluating the credibility of a claimant's statements regarding his symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location,

duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.* (citing 20 C.F.R. § 404.1529(c)(3)). While an ALJ "may discount subjective complaints of pain that are inconsistent with the evidence as a whole . . . , the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (citations omitted). The lack of objective medical evidence is merely one factor to consider, along with the other factors listed in § 404.1529(c)(3). *Id.*

After summarizing Lacher's allegations, the ALJ began her subjective symptom evaluation with the following paragraph:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

(Tr. 24.)

Lacher argues that the ALJ erred in using this "meaningless boilerplate" language and failed to engage in a meaningful, reviewable analysis of his subjective allegations. (Pl.'s Br. at 17–19.) In particular, he criticizes the ALJ for failing to address his hearing testimony that he could not perform even a sit-down job because he needed to get up and walk around for about fifteen minutes every hour. (*Id.* at 17 (citing Tr. 49–50).) The ALJ's alleged failure to address this testimony was crucial, in Lacher's view, as the vocational expert testified that a

11

hypothetical person of Lacher's age, education, and work experience could not perform his past job as a recycler if he needed to be off task for approximately five minutes every half hour. (Pl.'s Br. at 17.) The Commissioner argues that the ALJ considered Lacher's subjective allegations of disabling symptoms, applied the correct legal standard for evaluating those symptoms, and reasonably determined that Lacher had failed to demonstrate that he was unable to perform sustained work activity. (Def.'s Br. at 4–10.)

While the Seventh Circuit has cautioned against the use of boilerplate, *Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012), the use of this language, in and of itself, does not warrant remand. Boilerplate is only problematic when it "'fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.'" *Id.* at 645 (citing *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). Thus, the ALJ's use of boilerplate language in this case was not reversible error, as the ALJ provided "sufficient reasons, grounded in evidence in the record, to support her ultimate determination." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (citing *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013)). The ALJ's subjective symptom analysis began, but did not end, with the above boilerplate paragraph. Rather, the ALJ specifically explained how the evidence of record did not fully support Lacher's allegations concerning the intensity, persistence, and limiting effects of his impairments.

The ALJ described in detail the objective medical evidence (Tr. 24–25) and reasonably concluded that "[t]he medical evidence failed to indicate [Lacher] experienced symptoms that cause work-related functional limitations beyond those described [in the RFC assessment]" (Tr. 25). Although the record showed that Lacher had a history of compression fractures in his lumbar spine that sometimes resulted in limited range of motion and tenderness (Tr. 308–

10, 316–17, 320–24, 326, 342, 343–50, 365), upon physical examination, Lacher often had normal reflexes, sensation, muscle strength, and gait (Tr. 320, 324, 326, 346, 348–50, 365, 410). Thus, the ALJ complied with SSA regulations directing adjudicators to consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence." 20 C.F.R. § 404.1529(a).

The ALJ also reasonably determined that Lacher "reported improvement with chiropractic care and indicated increased ability in performing some activities of daily living." (Tr. 25.) After about a dozen sessions, Lacher's chiropractor concluded that Lacher responded very well to his care and was happy with the outcome of his treatment. (Tr. 348–60.) Indeed, during one visit in February 2015, Lacher reported that he was "able to engage in more daily activities like snow shoveling with less flareup." (Tr. 359.) A few weeks later, Lacher told Dr. Robey that he was using only ibuprofen for pain. (Tr. 326.) The ALJ therefore properly identified Lacher's daily activities, the effectiveness of medication, and other treatment as factors that weighed against Lacher's subjective allegations. *See* § 404.1529(c)(3)(i), (iv), (v).

Finally, the ALJ did not commit reversible error by failing to discuss specific portions of Lacher's testimony or functional reports. For one, ALJs do not need to "provide a complete written evaluation of every piece of testimony and evidence" in the record. *Murphy*, 759 F.3d at 815 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). Moreover, the omissions alleged here were harmless. Lacher testified that he was unable to stay on task for a sit-down job. But that was in 2017. Lacher did not testify to experiencing similar limitations during the relevant time period—that is, between the alleged onset date (February 13, 2014) and the date last insured (September 30, 2015). Also, contrary to Lacher's suggestion, the ALJ did indicate that she considered his disability and functional reports. (Tr. 24 (citing Tr. 194–

13

202, 212–21, 224–39, 242–49).) And, as outlined above, the ALJ explained why she did not fully credit those disabling allegations.

## CONCLUSION

Lacher argues that the ALJ erred in evaluating (1) the opinion of his treating physician and (2) his subjective complaints of disabling symptoms. I find that the ALJ did not err and that the decision is supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of December, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge